**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CEVA ANIMAL HEALTH, LLC, a Kansas limited liability company, )<br><br>Plaintiff, )<br><br>v. )<br><br>ANN BONCIMINO, PETS WITH PANACHE, INC. and JOHN DOES 1-10, individually or as corporations/business entities, )<br><br>Defendants. ) | Case No:  23-2451<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C §§ 1114, 1125(A), AND RELATED STATE CLAIMS**

Plaintiff Ceva Animal Health, LLC ("Ceva" or "Plaintiff"), brings this action against Defendants Ann Boncimino ("Boncimino"), Pets with Panache, Inc. ("Pets with Panache"), and John Does 1-10 (collectively, "Defendants") for: (1) breach of contract; (2) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (3) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) common law trademark infringement; (5) common law unfair competition; and (6) tortious interference with existing contracts and business relationships.  These claims arise from Defendants' misappropriation of Ceva's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Ceva's trademarks.  In support of its complaint, Ceva alleges as follows:

**PARTIES**

1. Ceva is a limited liability company, organized under the laws of Kansas, with its principal place of business located in Lenexa, Kansas.

2.      Defendant Pets with Panache is a New York corporation with a principal place of business in Mount Sinai, New York.  Pets with Panache operates the Amazon.com ("Amazon") storefront "Pets with Panache," with MerchantID A705BN35RRCL9 ("Amazon Storefront")[1]; the Walmart.com ("Walmart") storefront "Pets With Panache Inc" ("Walmart Storefront")[2]; the eBay.com ("eBay") storefront "Pets with Panache" ("eBay Storefront")[3]; the newegg.com ("newegg") storefront "PETS WITH PANACHE INC STORE" ("newegg Storefront")[4]; the kmart.com ("kmart") storefront "Pets With Panache Inc" ("kmart Storefront")[5]; the Sears.com ("Sears") storefront "Pets With Panache Inc" ("Sears Storefront")[6]; and on a private website called "petswithpanache.com"[7] ("Private Website," collectively with Amazon Storefront, Walmart Storefront, eBay Storefront, newegg Storefront, kmart Storefront, and Sears Storefront, "the Storefronts").  Pets with Panache does business throughout the United States through the Storefronts, including in Kansas.

3.      Defendant Boncimino is a natural person who, upon information and belief, resides in Mount Sinai, New York.  Boncimino owns and operates Pets with Panache and all of the Storefronts.  Boncimino does business throughout the United States through the Storefronts, including in Kansas.

4.      Ceva believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The

---

[1] Amazon sellers can change the name of their storefronts, but the Merchant ID remains the same.  The Amazon Storefront is available here:
https://www.amazon.com/sp?_encoding=UTF8&asin=&isAmazonFulfilled=&isCBA=&marketplaceID=ATVPDKI KX0DER&orderID=&seller=A705BN35RRCL9&tab=&vasStoreID= (last accessed October 2, 2023).
[2] The Walmart Storefront is available here: https://www.walmart.com/seller/2518 (last accessed October 2, 2023).
[3] The eBay Storefront is available here: https://www.ebay.com/str/petswithpanache (last accessed October 2, 2023).
[4] The newegg Storefront is available here:  https://www.newegg.com/Seller-Store/Pets-With-Panache-Inc  (last accessed September 22, 2023).
[5] The kmart Storefront is available here: https://www.kmart.com/seller/10349304 (last accessed October 2, 2023).
[6] The Sears Storefront is available here: https://www.sears.com/seller/10349304 (last accessed October 2, 2023).
[7] The Private Website is available here: https://petswithpanache.com/ (last accessed October 2, 2023).

true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Ceva.  Therefore, Ceva sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Ceva will seek leave to amend this Complaint accordingly.  If Ceva does not identify any such parties, it will dismiss these defendants from this action.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Ceva's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Kansas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Kansas and established sufficient minimum contacts with Kansas by, among other things, advertising and selling substantial quantities of infringing products bearing Ceva's trademarks to consumers within Kansas through a highly interactive commercial website, with knowledge that Ceva is located in Kansas and is harmed in Kansas as a result of Defendants' sales of infringing products to Kansas residents.  Defendants know that Ceva is located in Kansas, among other reasons, because they received a cease-and-desist letter informing them that Ceva is located in Kansas and is harmed in Kansas by their unlawful actions. Defendants also entered into a sell-through agreement with Ceva that provided that the agreement is governed by Kansas law.  Ceva's claims arise out of Defendants' substantial and regular sales of infringing products bearing Ceva's trademarks to Kansas residents.

7.    Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Ceva & Its Trademarks

8.    Ceva researches, develops, and markets high quality veterinary, vaccine, and health products for pets ("Ceva products").  Ceva allows its products to be sold to end-user consumers in the United States only by Ceva itself and by sellers whom Ceva has expressly authorized to sell Ceva products ("Authorized Sellers").  These sellers include retailers and authorized veterinarian clinics.

9.    Ceva allows Authorized Sellers to sell Ceva products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Ceva Rules").

10.    Ceva devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Ceva products to end-user consumers exclusively through itself and its Authorized Sellers that are required to follow the quality controls and other requirements in the Ceva Rules, Ceva ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive markets for veterinary, vaccine, and health products for pets, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

11.    To promote and protect its brands, Ceva has secured the rights to numerous trademarks relating to its business that are registered with the United States Patent and Trademark

4

Office.   These trademarks include, but are not limited to: FELIWAY® (U.S. Trademark Registration Nos. 5,314,421; 2,189,709), ADAPTIL® (U.S. Trademark Registration Nos. 5,319,655; 4,004,586), VECTRA 3D® (U.S. Trademark Registration No. 3,571,569), CATEGO® (U.S. Trademark Registration No. 5,157,641), DOUXO® (U.S. Trademark Registration No. 3,297,625), THUNDERWORKS® (U.S. Trademark Registration No. 4,704,258), THUNDERSHIRT® (U.S. Trademark Registration No. 4,277,385), THUNDEREASE® (U.S. Trademark Registration No. 5,346,433), THUNDERWUNDERS ((U.S. Trademark Registration No. 5,712,741) and THUNDERLEASH® (U.S. Trademark Registration No. 4,456,484) (collectively, the "Ceva Trademarks.")

12.     The registration for each of the Ceva Trademarks is valid, subsisting, and in full force and effect.

13.     Ceva actively uses, advertises, and markets all of the Ceva Trademarks in commerce throughout the United States.

14.     Consumers recognize the Ceva Trademarks as being associated with high quality veterinary, vaccine, and health products for pets.

15.     The Ceva Trademarks are widely recognized by the general consuming public of the United States and Ceva is recognized as the source of products bearing the Ceva Trademarks.

16.     Due to the superior quality and exclusive distribution of Ceva's products, and because Ceva is recognized as the source of high quality products, the Ceva Trademarks have substantial value.

**Online Marketplaces and the Challenge They Present to Ceva Product Quality**

17.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2022, the percentage of total retail sales in the United States that were completed through

e-commerce channels rose from 3.8% to 14.7%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 17, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

18. In 2022, consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021. *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

19. While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

20. Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

21. Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

22. Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by

authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

23.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/.

24.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance

Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

25.     In January 2020, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

26.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit,"

"pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf. Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

27. Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers and their pets—particularly when, as here, a brand owner's products are injected into, and ingested by, pets.

28. The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

29. When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

30.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

31.     When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

32.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

33.     Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews. Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

34.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews. For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family. Jamie Pitman, *Local Consumer Review Survey 2022*, BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/. The mere presence of reviews on an online product page can also increase conversion by up to 270% when compared to product pages that do not display reviews. Tom Collinger, *How Online Reviews Influence Sales*,

NORTHWESTERN   UNIVERSITY,   https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

35.    Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

36.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.  For all of these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

**Ceva's Reputation and Goodwill Have Been Harmed by Numerous
Online Reviews Written by Consumers Who Purchased Poor Quality
Products from Unauthorized Sellers on Online Marketplaces**

37.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

38.     Numerous consumers have written negative reviews of Ceva products being offered for sale on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Ceva products low "ratings" and complained of receiving products that were previously used, unsealed, tampered with, missing components, empty, defective, and of worse quality than other Ceva products consumers had previously purchased:

39.     For example, Defendants have sold on Amazon the Ceva product seen in the screenshot below:



40.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were previously used, tampered with, missing components, empty, and of worse quality than other products consumers had previously purchased:

12

 SV Family

★☆☆☆☆ **It came used**
Reviewed in the United States us on January 29, 2023
**Verified Purchase**
I ordered this and a Comfort Zone Spray. Both of the products came opened. This box was open when I opened the bag. I'm hoping it hasn't been tampered with.
One person found this helpful

 Mrs Book Pig

★☆☆☆☆ **Sent used, empty package**
Reviewed in the United States us on December 6, 2022
**Verified Purchase**
What a rip off. Took ages to come, and when it arrived it was an old second hand package with an empty plug in. Not cool.

2 people found this helpful

 Cat Woman

★☆☆☆☆ **IT SMELLS LIKE SOMETHING IS BURNING. I WILL TRY TO RETURN. LEAKS TOO.**
Reviewed in the United States us on November 29, 2022

**Verified Purchase**

This is not a good quality defuser. I have had them before without issue. Smells strange.

 Amazon_Customer Marcos :)

★☆☆☆☆ **Product came already used**
Reviewed in the United States us on June 28, 2022
**Verified Purchase**

Sticker seals on bottom of box were already opened. Product was used and did not look new.



 Amazon Customer

★☆☆☆☆ **Almost empty on arrival**

Reviewed in the United States US on May 15, 2022

Verified Purchase

Very little liquid in the bottle for 30 dollars!



 SUSANNE H.

★☆☆☆☆ **Package not complete missing parts, looked like it was used**

Reviewed in the United States US on March 15, 2022

Verified Purchase

Did not come with the 48 ml refill only plug in diffuser! looked used.

 Joanne Shattuck

★☆☆☆☆ **Received product half gone...**

Reviewed in the United States US on July 29, 2022

Verified Purchase

Order the two pack...first package was fine. 2nd package appeared to have been a return because half of the product was gone. This stuff is not cheap so to receive half empty makes me mad... where is the quality control in doung business?



  41. The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Ceva products listed on Amazon that Defendants have sold through their Amazon Storefront.  These reviews harm the reputation and goodwill of Ceva and its brands because consumers around the world view and rely on these reviews, even when purchasing Ceva products offline.  Even when the text of a review makes clear that a problem was seller-caused, negative reviews still lower the average review score and search placement of Ceva products.

42.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Ceva Trademarks on Amazon and are not subject to Ceva's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Ceva products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Ceva Trademarks from Defendants.

**Ceva Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused by Online Marketplaces and Ensure Customers Receive the Genuine, High Quality Products They Expect from Ceva**

43.     The above reviews show how sales of poor quality Ceva products disappoint Ceva's consumers and cause significant harm to the reputation and goodwill of Ceva and its brands.  To protect itself and consumers from these harms, Ceva implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Ceva itself sells to consumers.

44.     The goals of Ceva's quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Ceva products, including consumers who buy online and those that purchase in a brick-and-mortar setting, receive the high quality products and services they expect from products sold under the Ceva name.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Ceva Trademarks.

45.     Ceva's ability to exercise quality controls is particularly important for the products it sells because some of Ceva's products are ingested or inhaled by animals and there may be health and safety risks associated with products that have not been properly inspected, stored, or handled.

46.     Ceva abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

47.     Ceva's ability to exercise its quality controls is essential to the integrity and quality of Ceva products, as well as the value of the Ceva Trademarks and other intellectual property.

**Authorized Sellers May Sell Ceva Products Only Through Specific Channels and Must Adhere to Ceva's Quality Control and Customer Service Requirements**

48.     Ceva maintains strict quality controls over Ceva products by allowing Ceva products to be purchased by end-user consumers only from Ceva itself or from Authorized Sellers. Ceva's Authorized Sellers include "Authorized Distributors" and "Authorized Resellers."

49.     All of Ceva's Authorized Sellers are permitted to sell Ceva products only in certain channels and are required to abide by the Ceva Rules.  Thus, every Authorized Seller that sells Ceva products is subject to Ceva's quality control requirements.

50.     The Ceva Rules require Authorized Sellers to purchase Ceva products only from Ceva directly or from other Authorized Sellers, per the applicable policy.  This restriction ensures that the chain of custody can be established for all Ceva products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low quality products from entering into the distribution chain.

51.     The Ceva Rules also limit to whom and where Authorized Sellers may sell Ceva products.  To prevent persons outside of Ceva's quality controls from acquiring and reselling Ceva products, the Ceva Rules prohibit Authorized Sellers from selling Ceva products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are permitted to sell Ceva products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

52.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also permitted to sell Ceva products online only on websites that they themselves own and operate or, in certain circumstances, that are owned and operated by another Authorized Seller.

Authorized Sellers are prohibited from selling Ceva products on any other website—including on any online marketplace website—unless they first apply for and receive written approval from Ceva.

53.     These restrictions are essential to Ceva's ability to exercise its quality controls over Ceva products because they prevent unauthorized sellers from obtaining and reselling Ceva products and allow Ceva to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Ceva can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Ceva is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

54.     In addition to restricting where and how Authorized Sellers can sell Ceva products, the Ceva Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Ceva products.

55.     To ensure that customers receive the genuine and high quality products they expect from Ceva, the Ceva Rules require Authorized Sellers to inspect all Ceva products for any damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from their inventory.  Authorized Sellers are prohibited from selling damaged or defective products and are required to report any discovered defects to Ceva to assist it with identifying any product quality issues.

56.     Authorized Sellers must also regularly inspect their inventory for any products that are expired ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of Not-Current Products in accordance with instructions provided by Ceva.

57.     The Ceva Rules also require that Authorized Sellers store Ceva products in accordance with their labeled requirements and other further guidelines issued by Ceva.  These requirements help ensure that Ceva products are stored properly and are not damaged prior to being shipped to the consumer.

58.     To avoid consumer confusion and ensure that customers receive genuine Ceva products, Authorized Sellers must sell Ceva products in their original packaging and are prohibited from relabeling, repackaging, diluting, or altering Ceva products or any accompanying label, literature, or safety-related information without Ceva's consent.  Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

59.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Ceva products, including any serial number, UPC code, or other identifying information.

60.     The Ceva Rules give Ceva the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Ceva products, to ensure their compliance with Ceva's quality control requirements.  During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of their sources of all Ceva products.  If Ceva discovers that an Authorized Seller is failing to follow the Ceva Rules, Ceva has the right to cease selling its products to the Authorized Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

61.     Authorized Sellers must also communicate all safety information to consumers and cooperate with Ceva with respect to any product recall or other consumer safety information dissemination effort conducted by Ceva regarding Ceva products.

62.     The Ceva Rules also require Authorized Sellers to provide various customer services to their customers.  For example, Authorized Sellers must familiarize themselves with the features of all Ceva products kept in their inventory so they can advise customers on the selection and safe use of Ceva products.  Authorized Sellers must also report to Ceva any customer complaint regarding a Ceva product, assist Ceva in investigating any such complaint, and help customers themselves contact Ceva's customer service if needed.

63.     Ceva's quality control and customer service requirements are legitimate and substantial and have been implemented so that Ceva can control the quality of goods manufactured and sold under the Ceva Trademarks, to protect consumers as well as the value and goodwill associated with the Ceva Trademarks.

64.     Ceva's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Ceva product they were considering buying was being sold by an Authorized Seller who is subject to Ceva's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Ceva's quality controls and over whom Ceva is unable to exercise its quality controls.

### Given the Flood of Poor Quality Products Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Ceva Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

65.     As shown in the consumer reviews cited above (*see* ¶¶ 38-41, *supra*), Ceva products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.  Given these heightened risks to

19

consumer satisfaction and the value of its trademarks that are posed by online sellers, Ceva imposes additional quality control requirements on all of its Authorized Sellers that sell Ceva products online.

66.     The Ceva Rules allow Authorized Sellers to sell Ceva products to end-user consumers online only through "Permissible Public Websites," "Veterinary Home Delivery Platforms," and "Authorized Websites."  These rules allow Ceva to oversee all Authorized Sellers who sell Ceva products online.

67.     A "Permissible Public Website" is a website that:  (1) is operated by a Ceva Authorized Reseller in the Authorized Reseller's own legal name or registered fictitious name, (2) is not a third-party storefront on an online marketplace website; and (3) lists the Authorized Reseller's mailing address, telephone number, and email address.  A "Veterinary Home Delivery Platform" is a website or mobile application that: (1) is operated by an Ceva Authorized Distributor; (2) is used to facilitate orders of Ceva products from end-user consumers who are direct customers of a Ceva Authorized Seller that operates a veterinary clinic; and (3) requires customers to create an account with the Authorized Seller veterinary clinic to be able to purchase Ceva products.

68.     Authorized Sellers must receive prior written approval from Ceva before they can sell Ceva products on any website that does not meet the criteria of a Permissible Public Website or Veterinary Home Delivery Platform.  To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Ceva products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Ceva that includes review of their business operating business record and

online review history.  A website that Ceva permits an Authorized Seller to use through this process is called an "Authorized Website."

69.     Online marketplaces, including Amazon, do not qualify as "Permissible Websites" or "Veterinary Home Delivery Platforms" because they are operated by third parties rather than any Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Ceva and specifically approved to sell on an online marketplace.

70.     The Ceva Rules impose numerous additional requirements on Authorized Sellers who sell Ceva products on Permissible Public Websites, Veterinary Home Delivery Platforms, or Authorized Websites (collectively, "Authorized Online Sellers").

71.     For example, Authorized Online Sellers must use images of Ceva products that are provided or approved by Ceva and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Ceva product they do not carry in their inventory.

72.     The Ceva Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Ceva or another third party.  These requirements allow consumers of Ceva products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Ceva to protect the public from the sale of poor quality or counterfeit Ceva products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

73.     Authorized Online Sellers who sell Ceva products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Ceva.  At Ceva's

request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Ceva products.

74.     Unless otherwise approved by Ceva, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Ceva products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Ceva products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Ceva's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Ceva's quality controls.

75.     All websites where Authorized Online Sellers sell Ceva products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Ceva upon request; and (iii) cooperate with Ceva in investigating negative online reviews related to sales of Ceva products.

76.     The additional quality control requirements that Ceva exercises over online sales of its products are legitimate and substantial and have been implemented to allow Ceva to carefully control the quality of Ceva products that are sold online and quickly address any quality issues that arise.

77.     Ceva's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Ceva products online receive genuine, high quality Ceva products that abide by Ceva's quality controls.  Consumers purchasing Ceva products online would

find it relevant to their purchasing decision to know whether a product they are buying is vended by Ceva or by one of its Authorized Online Sellers that is subject to, and abides by, Ceva's quality controls.

### Ceva Monitors and Audits Its Authorized Online Sellers to Ensure They Comply With Its Quality Control Requirements

78.     Ceva regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Ceva carries out its auditing and monitoring actions pursuant to an internal program called the Ceva Online Quality Control Auditing Program ("Auditing Program").

79.     As part of its Auditing Program, Ceva examines a rotating sample of Permissible Public Websites on a regular basis to ensure that the Authorized Online Sellers who sell through the websites are complying with the Ceva Rules.  During these examinations, Ceva checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Ceva or a third party; (iii) do not display any content that could be detrimental to Ceva and its brands; (iv) do not make any representations regarding Ceva products that are misleading; (v) exclusively contain images of Ceva products and product descriptions that are supplied or authorized by Ceva and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

80.     Ceva also periodically inspects online reviews of Ceva products and Authorized Online Sellers that appear on Permissible Public Websites.  If Ceva discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Ceva products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Ceva communicates with the responsible Authorized

Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

81.     Ceva also periodically conducts a test purchase of a Ceva product from a rotating sample of Permissible Public Websites.  If Ceva discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Permissible Public Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Ceva communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

82.     If Ceva discovers that an Authorized Online Seller is selling Ceva products of poor quality or otherwise not adhering to Ceva's quality control or customer service requirements, Ceva may conduct an investigation to determine the source of the problem.  The Ceva Rules require that Authorized Online Sellers cooperate with Ceva's investigation, permit Ceva to inspect their facilities and records relating to Ceva products, and disclose all information about where they obtained Ceva products.  Based on what its investigation reveals, Ceva has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

**Genuine Ceva Products Come with Ceva's 60-Day Satisfaction Guarantee; Products Sold by Defendants Do Not**

83.     Non-prescription Ceva products that are purchased from Ceva directly or from an Authorized Seller also come with Ceva's 60-day satisfaction guarantee (the "Satisfaction Guarantee").

84.     Under the Ceva Satisfaction Guarantee, a customer is able to receive a full refund of the purchase price of a Ceva product within 60 days of the original purchase date if the customer

is dissatisfied with the product for any reason.  The complete terms of the Ceva Satisfaction Guarantee can be viewed on Ceva's brands' websites (for example, at https://us.feliway.com/pages/returns-policy) and are incorporated herein.

85.     Ceva extends the Ceva Satisfaction Guarantee only to products that were sold by sellers who are subject to Ceva's quality controls.  Because products sold by unauthorized sellers are not subject to Ceva's quality controls and Ceva cannot ensure the quality of such products, the Ceva Satisfaction Guarantee does not cover Ceva products sold by unauthorized sellers, including Defendants.  The Ceva Satisfaction Guarantee specifically states that "because we are unable to control the quality of our products sold by unauthorized sellers . . . the Ceva 60-Day Satisfaction Guarantee is not available for products purchased from unauthorized sellers, including unauthorized internet sites."

### Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Ceva Trademarks

86.     Because the unauthorized sale of Ceva products over the Internet threatens the reputation and goodwill associated with the Ceva Trademarks, Ceva actively monitors the sale of its products online.

87.     In the course of this monitoring, Ceva discovered that high volumes of products bearing the Ceva Trademarks were being illegally sold on the Amazon Storefront, eBay Storefront, newegg Storefront, kmart Storefront, Sears Storefront, and Walmart Storefront, all of which are owned and operated by Defendants.  Ceva also discovered the Private Website selling products bearing the Ceva Trademarks.

88.     Boncimino and Pets with Panache are not Authorized Seller of Ceva products and are not subject to, and do not comply with, the Ceva Rules or the quality controls that Ceva imposes on its Authorized Sellers.

89.     On July 26, 2022, counsel for Ceva sent a cease-and-desist letter to Boncimino and Pets with Panache.  The letter explained that Defendants are infringing the Ceva Trademarks by selling products on the Internet that are materially different from genuine products sold by Ceva's Authorized Sellers and that are not subject to, do not abide by, and interfere with Ceva's quality controls.  The letter also explained that Defendants are tortiously interfering with Ceva's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are not Authorized Sellers and who resell the products.  The letter also informed Defendants that Ceva is located in Kansas, is harmed in Kansas as a result of Defendants' illegal sales of infringing products bearing the Ceva Trademarks, and that Defendants will be subject to personal jurisdiction in Kansas if Ceva files suit.  Ceva's letter demanded that Defendants permanently cease selling products bearing the Ceva Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

90.     Defendants did not respond to Ceva's July 26, 2022 letter and continued to advertise and sell products bearing the Ceva Trademarks.  Ceva sent additional letters on August 18, 2022 and September 29, 2022 and Defendants did not respond.

91.     Finally, after receiving a letter dated October 26, 2022, Defendants responded indicating that the infringing listings had been removed.  Despite this, Defendants resumed listing Ceva products.

92.     Finally, in June 2023, Defendants approached Ceva about becoming authorized to sell Ceva products on the Internet.  Given the foregoing history, Ceva declined to make defendants Authorized Resellers, and Defendants again agreed to stop listing Ceva products.

93.     On June 14, 2023, Ceva reminded Defendants that they had agreed to stop listing Ceva products and threatened litigation if Defendants' infringing conduct continued.

94.     Ceva and Defendants were able to reach an agreement as of July 17, 2023, wherein Defendants were permitted a short time to sell through their remaining inventory of Ceva products, and agreed "Seller [Boncimino and Pets with Panache] *will not sell*, either through itself or through any entity owned or controlled by Seller or by anyone in its employ or control, any Ceva Products *at any time after August 30, 2023*," and "[n]either Seller nor any employee or agent acting at its direction or on its behalf will acquire or attempt to acquire Ceva Products for the purpose of resale *at any time*." [8]

95.     The agreement also provided that: (1) it is governed by Kansas law and (2) if Boncimino and Pets with Panache breached the agreement, they would "be responsible for payment of the attorneys' fees incurred by Ceva relating to its enforcement of the Agreement."

96.     Boncimino and Pets with Panache did not comply with the sell-through agreement. On August 16, 2023, Ceva contacted Defendants expressing concern that they had obtained additional product in breach of the agreement.  In response, Boncimino and Pets with Panache expressed that they intended to sell Ceva Product on the Website, in direct violation of the Agreement.

97.     On September 5, 2023, counsel for Ceva wrote to Boncimino and Pets with Panache by email and informed them that they were breaching the sell-through agreement by continuing to sell products on the Website.

98.     On September 26, 2023, counsel for Ceva again wrote to Boncimino and Pets with Panache by email and attached a draft complaint regarding Defendants' unauthorized sales and breach of the agreement.

---

[8] Ceva has not filed the sell-through agreement with its complaint because the sell-through agreement is confidential and is in Defendants' possession.

99.     To date, no Defendant has responded to Ceva's September 5 email or any of Ceva's subsequent correspondence.  Defendants have also continued to advertise and sell products bearing the Ceva Trademarks through their Website.

100.    Defendants' disregard of Ceva's cease-and-desist communications and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

101.    Defendants have sold a high volume of infringing products bearing the Ceva Trademarks through their Amazon Storefront and other Storefronts.

102.    Upon information and belief, through their storefronts on highly interactive websites, Defendants accept and fulfill orders from Kansas residents for products bearing the Ceva Trademarks and cause substantial quantities of infringing products bearing the Ceva Trademarks to be shipped to persons located in Kansas through the regular course of business.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Ceva's Quality Control and Customer Service Requirements**

103.    Defendants, without authorization from Ceva, have sold—and are continuing to sell—products bearing the Ceva Trademarks through their Storefronts.  Defendants may also be selling products through additional channels that Ceva has not yet discovered and cannot discover until it is able to take discovery.

104.    Ceva has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine Ceva products because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

105.    Ceva's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Ceva has lost control of the quality of goods that bear its trademarks.

106.    Defendants do not abide by Ceva's quality control requirements because they sell products on Amazon.  Ceva does not allow any of its Authorized Sellers to sell Ceva products on Amazon unless they obtain Ceva's approval because of the goodwill and consumer safety issues associated with uncontrolled sales on online marketplaces discussed above. *See* ¶¶ 19-41, *supra*.

107.    Defendants also do not abide by Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not provided Ceva with their business information nor given Ceva an opportunity to vet them to determine if they meet Ceva's high standards for what it demands of its Authorized Sellers that it approves to sell Ceva products online through Authorized Websites.  Instead, Defendants sell products online without Ceva's authorization or oversight.

108.    Defendants also do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not disclosed to Ceva where they sell Ceva products online.  Defendants also do not provide customer feedback to Ceva that relates to their sales of products bearing the Ceva Trademarks or cooperate with Ceva in investigating negative online reviews relating to their sales of products bearing the Ceva Trademarks, as Authorized Online Sellers are required to do.  These actions prevent Ceva from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Ceva Trademarks.

109.    Defendants do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they: (1) have not disclosed to Ceva where they acquire all products that bear the Ceva Trademarks; and (2) have not given Ceva the right to audit and inspect their facilities and records.  As a result, among other things, Ceva cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) selling products only in official and unaltered Ceva packaging; (iv) improperly allowing products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.  Ceva also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

110.    Customers have written numerous reviews of Defendants' Amazon Storefront in which they complained of poor service from Defendants and of receiving products—including products bearing the Ceva Trademarks—that were  misleading, damaged, near expiration, and counterfeit:

> ★☆☆☆☆    "This item was a counterfeit product and will not be ordering from them again. It came in a different colored pkg for the size so it was obvious that it was not the true product"
>
> Read less
>
> By Birdie on July 27, 2022.
>
> "Vectra has changed its boxes. All purple with a circle with original color of box which contains weight"
>
> By Pets with Panache on July 27, 2022.

 "I needed these to give my ********* Rottweiler with bone cancer her pain medication until she goes back to the doctor in a couple of days and they were nothing but a BROKEN INTO A MILLION PIECES MESS!!! "

Read less

By Brenda Sugar on May 28, 2021.

 "You may be tempted to buy from this seller because of price. Don't do it. "

By maria g on July 10, 2022.

 "Either I misread the information or something happened. These little pockets are very small. Have to use two for a regular size pill. Will use but will be more careful next time. "

Read less

By Pat Zimmerman on April 17, 2021.

 "FRAUDULENT. This medication was clearly opened and diluted with some sort of oil. It arrived leaking badly with the top not even screwed back on tightly. The worst part is that my dog is in itching agony and I have to reorder **from a different seller** and wait for it to arrive. DISGRACEFUL. "

Read less

By Wendy D on April 9, 2020.

111.    These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefront.

112.    Likewise, Defendants received negative reviews on the Walmart Storefront regarding their inadequate customer service:


★☆☆☆☆                                             11/06/2016

I still have not recieved my purchase . I have contacted walmart and the company that was supposed to send the items and have not gotten a response . I would not order from this company again and probably not from walmart again

Jackie

31

113.    Ceva allows its products to be sold only by itself and by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

114.    These reviews, along with the numerous negative customer reviews of Ceva products that Defendants have sold, *see supra* ¶¶ 38-42, show that Defendants are very likely not carrying out the quality control inspection, storage, or handling requirements that Ceva requires Authorized Sellers to follow for Ceva products.  Instead, Defendants are likely selling products bearing the Ceva Trademarks to consumers that are previously used, tampered with, not sealed, missing components, and damaged.  These sales cause customers to write highly negative reviews of Ceva products that harm Ceva's reputation and hurt the placement of Ceva products in search results.

115.    Defendants' failure to abide by the Ceva Rules prevents Ceva from exercising control over the quality of products Defendants sell bearing the Ceva Trademarks.  Unlike with its Authorized Online Sellers, Ceva cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

116.    Through their unauthorized use of the Ceva Trademarks, Defendants have misled— and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Ceva products.  In reality, however, the products sold by Defendants are materially different from genuine Ceva products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Do Not Come With the Ceva Satisfaction Guarantee**

117.   As set forth above, genuine Ceva products purchased from Ceva or Ceva's Authorized Sellers come with the Ceva Satisfaction Guarantee.  However, Ceva does not provide the Ceva Satisfaction Guarantee for products purchased from any other seller because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

118.   Because Defendants are not Authorized Sellers and are thus not subject to Ceva's quality control requirements, the products bearing the Ceva Trademarks that Defendants sell do not come with the Ceva Satisfaction Guarantee.

119.   Because the products Defendants sell do not come with the Ceva Satisfaction Guarantee, they are materially different from genuine Ceva products.

120.   The Ceva Satisfaction Guarantee is a material component of genuine Ceva products.  Consumers considering whether to purchase Ceva products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Ceva Satisfaction Guarantee.  Consumers who purchase Ceva products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Ceva stands behind the product, and that they can get a refund or product replacement if they are not satisfied.

121.   Defendants' unauthorized sale of non-genuine products bearing the Ceva Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Ceva products that come with the Ceva Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With
Ceva's Agreements With Its Authorized Sellers**

122.   As discussed, Ceva allows Ceva's products to be sold to end-user consumers only by itself and by Authorized Sellers.

123.    Ceva has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

124.    Defendants have sold and are continuing to sell a high volume of products bearing the Ceva Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.  Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

125.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

126.    Defendants have known that Ceva's contracts with its Authorized Sellers  prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

127.    Defendants have known of this prohibition since at least approximately July 26, 2022.  On that date, Ceva mailed a cease-and-desist letter to Defendants explaining that Ceva has agreements with all of its Authorized Sellers that prohibit them from selling Ceva products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products.

128.    Ceva's letter also informed Defendants that, by purchasing Ceva products from an Authorized Seller for the purpose of reselling them, they are causing a breach of the agreement between Ceva and its Authorized Seller and are interfering with Ceva's agreements and business relationships.

129. Ceva's July 2022 letter also advised Defendants that if they continued to acquire products from Ceva's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Ceva's contracts and business relationships with its Authorized Sellers.

130. Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

131. In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

132. Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Ceva Has Suffered Substantial Harm As a Result of Defendants' Conduct**

133. As set forth above, the unauthorized sale of products bearing the Ceva Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Ceva brand.

134. When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Ceva. As such, Defendants' ongoing sale of non-genuine products bearing the Ceva Trademarks harms Ceva and its brands.

135.     Ceva has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

136.     Ceva has also suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

137.     Ceva is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Ceva Trademarks, causing continued irreparable harm to Ceva's reputation, goodwill, relationships, intellectual property, and brand integrity.

138.     Additionally, Ceva is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

139.     Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

140.     Defendants' willful infringement of the Ceva Trademarks and continued pattern of misconduct demonstrate intent to harm Ceva.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

141.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

142.     Pets with Panache and Boncimino entered into a valid and enforceable contract with Ceva.

143.     Ceva has performed all of its obligations under the contract.

144.     Pets with Panache and Boncimino have breached their contract with Ceva by: (1) continuing to sell Ceva products on the Internet; and (2) continuing to purchase or otherwise acquire Ceva products for the purpose of reselling them on online marketplaces.

145.     Pets with Panache and Boncimino have not cured these breaches and continue to breach their contract with Ceva.

146.     Pets with Panache and Boncimino have no legal excuse for failing to perform their obligations under the contract.

147.     As a proximate result of Pets with Panache and Boncimino's breaches of the parties' contract, Ceva has suffered damages, including loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

148.     The contract provides that, in the event of breach, Pets with Panache and Boncimino will be responsible for paying attorneys' fees that Ceva incurs in enforcing the contract. Accordingly, Ceva is entitled to recover its reasonable attorneys' fees incurred in enforcing its rights and obligations under the contract and bringing this action.

**SECOND CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

149.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

150.     Ceva has secured the rights to each of the Ceva Trademarks.

151.     The Ceva Trademarks are registered with the United States Patent and Trademark Office.

152.     The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

153.    Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Ceva Trademarks without Ceva's consent.

154.    The products bearing the Ceva Trademarks that Defendants sell are not authorized for sale by Ceva.

155.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

156.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

157.    The products sold by Defendants are not, in fact, genuine Ceva products.  The products sold by Defendants are materially different from genuine Ceva products because, among other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

158.    Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks, and caused significant damage to Ceva's business relationships.

159.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

160.     Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

161.     Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

162.     Ceva is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Ceva Trademarks.

**THIRD CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

163.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

164.     As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

165.     Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

166.     Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

167.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

168.    Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

169.    Ceva is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

## FOURTH CAUSE OF ACTION
### Common Law Trademark Infringement

170.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.    Ceva has secured the rights to each of the Ceva Trademarks.

172.    The Ceva Trademarks are registered with the United States Patent and Trademark Office.

173.    The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

174.    The Ceva Trademarks are distinctive and widely recognized by the consuming public.  Ceva's products are sold and purchased by Ceva's network of Authorized Sellers throughout the United States, including in Kansas.

175.    Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in commerce for purposes of selling non-genuine products bearing the Ceva Trademarks in Kansas without Ceva's consent.

176.    Defendants' use of the Ceva Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and

originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

177.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

178.    The products sold by Defendants are not, in fact, genuine Ceva products.  The products sold by Defendants are materially different from genuine Ceva products because, among other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

179.    Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks, and caused significant damage to Ceva's business relationships.

180.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

181.    Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

182.    Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## FIFTH CAUSE OF ACTION
**Common Law Unfair Competition**

183.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

184.     As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

185.     Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

186.     Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

187.     Defendants' unauthorized sales of products bearing the Ceva Trademarks and unauthorized use of the Ceva Trademarks in advertising infringe the Ceva Trademarks and constitute unfair competition at common law.

188.     As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

189.     Ceva is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

190.     Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## SIXTH CAUSE OF ACTION
### Tortious Interference with Existing Contracts and Business Relationships

191.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

192.    Other than products that Ceva itself directly sells to consumers, Ceva products are sold to the public exclusively through Ceva's network of Authorized Sellers.

193.    Ceva has entered into valid and enforceable agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

194.    Defendants are not Authorized Sellers and have sold—and are continuing to sell—a high volume of products bearing the Ceva Trademarks on the Internet.  Ceva has also not itself sold any Ceva products to Defendants.

195.    Based on these facts, it is reasonable to infer that Defendants acquired the products they are selling at least in part from one or more of Ceva's Authorized Sellers.

196.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

197.    Defendants have known that Ceva's contracts with its Authorized Sellers  prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

198.    Defendants have known of this prohibition, among other reasons, because Ceva informed Defendants of this prohibition in a cease-and-desist letter it overnight mailed to Defendants on July 26, 2022.

199.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants so that Defendants could unlawfully resell them.

200.    In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

201.    Ceva's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale.  Although Ceva does not yet know which specific Authorized Seller(s) have breached their agreements with Ceva—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Ceva's claim of tortious interference.

202.    Defendants are not parties to the contracts they caused Authorized Sellers to breach.

203.    Defendants' actions have caused injury to Ceva for which Ceva is entitled to compensatory damages in an amount to be proven at trial.

204.    The injury to Ceva is immediate and irreparable, as Ceva's reputation and relationships have been damaged among its consumers and Authorized Sellers.

205.    Ceva is also entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Ceva's rights.

**PRAYER FOR RELIEF**

WHEREFORE, Ceva prays for relief and judgment as follows:

A.    Judgment in favor of Ceva and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, pre-judgment and post-judgment interest, and attorneys' fees, as permitted by law;

B.    That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Ceva Trademarks;

ii)    Prohibiting the Enjoined Parties from using any of the Ceva Trademarks in any manner, including advertising on the Internet;

iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Ceva Trademarks;

iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any

45

products sold by them which contain the Ceva Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Ceva's products, or any of the Ceva Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Ceva Trademarks which associate Ceva's products or the Ceva Trademarks with the Enjoined Parties or the Enjoined Parties' Storefronts;

vii)    Requiring the Enjoined Parties to take all action to remove their uses of the Ceva Trademarks from the Internet, including but not limited to, from the Amazon Storefront, eBay Storefront, kmart Storefront, Sears Storefront, newegg Storefront and Private Website; and

viii)   Requiring the Enjoined Parties to destroy or return to Ceva all products bearing the Ceva Trademarks in their possession, custody, or control.

C.      An award of attorneys' fees, costs, and expenses.

D.      Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ceva demands a trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Local Rule 40.2(a), Ceva designates Kansas City, Kansas as the place of trial for this matter.

Dated:  October 4, 2023

Respectfully submitted,

*/s/ Sean W. Colligan*
Sean W. Colligan, Kan. Bar  # 25727
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106-2150
Tel: (816) 691-3384
sean.colligan@stinson.com

***Attorneys for Plaintiff Ceva Animal Health, LLC***

Of Counsel:

Martha Brewer Motley (OH 0083788)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 4326-1008
(T) 614-464-5626
(F) 614-719-5080
mbmotley@vorys.com